Filed 3/11/26  In re K.W. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.W., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.N.,<br><br>Defendant and Appellant. | F090093<br><br>(Super. Ct. No. JD143986-00)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  Susan M. Gill, Judge.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Kendra L. Graham, Interim County Counsel, and Ana M. Ovando, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

T.N. (mother) appeals from an order made at a family maintenance status review hearing (Welf. & Inst. Code, § 364)[1] continuing dependency jurisdiction and family maintenance services over her now six-year-old son, K.W. (son).  Mother argues substantial evidence does not support the juvenile court's finding that the conditions that justified the assumption of jurisdiction continued to exist.  We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Section 300 Petition

Mother and son, who was then three years old, came to the department's attention in September 2022, when the department received a referral alleging mother was homeless, using drugs, and neglecting son.  A social worker could not locate mother and son until later in October 2022, when a family friend called the social worker and said mother left son with him and asked him to take care of son indefinitely because she had no way to feed him.  Son was taken into protective custody.

It took several days for mother to return the social worker's call.  Mother, who was 29 years old, admitted to having a history of marijuana and crystal use, which began when she was 12 or 13 years old.  Mother claimed she was sober from 2010 to 2012, and then relapsed, but had been sober for the past two years.  Mother reported she and son were registered members of the Tejon Tribe (the tribe).  Son's father, D.W., was with mother and told the social worker that he could not care for son at that time.

Mother was diagnosed with anxiety and ADHD but was not receiving mental health services.  Mother had a prior dependency court case due to substance abuse concerning son's half-sibling, who was removed from her care in 2013, and adopted in 2015 after mother failed to reunify with him and her parental rights were terminated. Mother and son both tested positive for amphetamines at son's birth, and while mother agreed to enter a substance abuse facility, she left after only five days.  Mother left a

_____

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2.

sober living facility several days before leaving son with the family friend and reported testing positive for PCP while at the facility.

During the investigation, son's non-relative extended family member caretaker reported that her spouse had known mother for over 15 years and she and her spouse had been working with mother and the tribe since son was a few days old to address mother's substance abuse problem. The caretaker reported attempting to assist mother by helping with son when she reached out to them, and that mother was very volatile, unstable, and aggressive.

Based on the above, the department filed a dependency petition alleging son came within the provisions of section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling). The juvenile court ordered son detained from mother and father and ordered twice-weekly two-hour supervised visits. Mother informed the court of her and son's membership in the Tejon Tribe, and the court found the Indian Child Welfare Act may apply.

***Jurisdiction and Disposition***

Son was placed in the non-relative extended family member caretakers' home. Mother had not enrolled in any of the recommended programs, she declined to drug test, and it was noted she could be volatile and aggressive. Mother entered a sober living facility on October 31, 2022, but she left the same day. At an uncontested jurisdiction hearing held in December 2022, the juvenile court found the petition's allegations true and continued the disposition hearing.

The disposition hearing was continued several times and ultimately held in June 2023. In December 2022, the tribe's representative told the department's social worker mother declined the tribe's offer to pay for inpatient treatment at two facilities outside Kern County to help her resolve her substance abuse problem. As of January 2023, mother continued to decline to drug test for the department. Mother entered a

residential substance abuse program, but she left the facility because she decided to return to an outpatient program.

By May 2023, mother completed her parenting and child neglect class, and she reported that she completed a mental health assessment and received a referral for therapy. Mother's participation in substance abuse counseling, however, was reported to be minimal and she demonstrated unsatisfactory progress. She missed 13 scheduled appointments and admitted she had been cheating the system and tampered with one test by using bottled pee. Mother declined to drug test for the department until it was court ordered. Mother had been visiting son regularly since the beginning of 2023, and the visits went well.

At the uncontested dispositional hearing, the juvenile court adjudged son a dependent and removed him from mother's physical custody. Family reunification services were ordered for mother, which included participation in substance abuse counseling, obtaining a mental health assessment and complying with the recommendations, and random drug testing. Family reunification services were not ordered for son's father, as he was an alleged father and did not seek to establish his parentage. Visitation remained at twice-weekly two-hour supervised visits.

*The Reunification Period*

A contested combined six- and 12-month review hearing was held in February 2024, at which mother testified. During the review period, mother enrolled in substance abuse counseling but had issues maintaining her sobriety. She missed several drug tests, tested positive for fentanyl, and her creatinine levels were abnormal on a few tests. Mother provided the department with two negative tests in October 2023. Due to her minimal participation and struggles in her substance abuse class, she was recommended to seek inpatient care, but she refused. Mother enrolled in another substance abuse program in December 2023. Mother had not provided verification of enrollment or participation in mental health treatment. Mother visited son consistently,

except for a few weeks when she visited once or not at all, and the visits were described as appropriate. Son's caregiver was designated a de facto parent in January 2024.

The juvenile court ordered the continuation of mother's reunification services over the department's recommendation to terminate them. In extending services to 18 months, the court found there was a substantial probability son would be returned to mother within the 18-month period, as mother consistently and regularly visited son, made significant progress in resolving the problems that led to son's removal, and demonstrated the capacity and ability to complete the treatment plan's objectives.

A contested 18-month review hearing was held in May 2024. The department recommended termination of mother's reunification services and setting a section 366.26 hearing.

The department's report confirmed mother completed the substance abuse program in March 2024, which reported her participation and progress were excellent, where she provided five negative drug tests between January 4 and February 5, 2024. Mother provided verification that a mental health assessment showed she did not qualify for treatment. Mother's drug tests for the department were negative, and she continued to be appropriate with son during visits.

Mother was granted a two-day unsupervised overnight visit with son at her home in April 2024. Since that visit, mother had unsupervised visits every weekend, which reportedly went well, but there was a domestic violence incident during one visit that son may have partially witnessed. That incident involved mother returning to her apartment after picking son up from school and father showing up "making a scene." Mother left son in the car with a family friend so he would not witness anything. Father was yelling and pushing his way into the apartment and started removing items that did not belong to him. He physically assaulted mother and shoved his daughter into the wall. Mother, who believed father was under the influence, contacted law enforcement. Mother made a police report and obtained an emergency protective order. Mother admitted to the social

worker that she had a history of domestic violence with father and denied having contact with him since that day.

The department asked mother to re-enroll in substance abuse after she twice failed to appear for testing, but she had not contacted the gateway team for a substance abuse assessment. Mother claimed she was attending AA/NA weekly. The department was concerned mother needed extra services to assist her with her sobriety and noted she was taking advantage of supportive services available through the tribe and the Bakersfield American Indian Health Project.

At the contested hearing, testimony was received from mother, the tribe's representative, and the caregiver. The department changed its recommendation and was no longer opposed to family maintenance, which the tribe supported. After hearing oral argument, the juvenile court ordered son returned to mother's custody with family maintenance services. Mother was ordered to participate in the Parents as Teachers (PAT) program, follow the gateway team's recommendations regarding substance abuse counseling or after care, attend weekly NA or AA meetings, and submit to random drug testing. Son was to have twice-monthly overnight visits with the caregiver.

### The September 2024 Section 364 Review Hearing

A contested section 364 review hearing was held on September 24, 2024. The department reported that mother had completed her original case plan, but she was not fully cooperative with the family maintenance plan. A June 20, 2024 assessment for substance abuse counseling showed mother did not meet the criteria for services. When mother missed a drug test a week later, the department asked her to be reassessed, but she had not done so. Mother's subsequent seven drug tests were negative. Mother was not participating in AA, as she claimed it triggered her and she would rather attend NA classes, but mother had not provided proof to the department that she was enrolled in either program. Mother signed up with the PAT program, but when the program facilitators reached out to mother, she was unresponsive, and she was rude and

6.

disrespectful at the July 5, 2024 intake appointment. Mother's PAT program referral was closed at the end of July 2024, because she violated the PAT program's attendance policy.

It appeared that mother was keeping son safe, but the department was concerned about son's stability and safety. These concerns included: (1) son reported mother allowed father, who had been physically aggressive toward mother in the past, into the home, but mother claimed son was confused and it was another male friend; (2) mother constantly had people in and out of her home, several people lived with her who the department had not assessed, and she had a pending eviction; (3) mother appeared to make decisions that did not always benefit son; (4) mother was slow about looking into programs that would assist her with resources despite the department's encouragement and referrals; and (5) mother displayed frustration and belligerence when asked to do something she did not agree with or she was not getting what she wanted. The department recommended the case remain open for another six months.

The juvenile court ordered family maintenance services to continue, and that mother should continue drug testing and enroll in substance abuse counseling if a test were presumed positive, participate in the PAT program, and continue to attend weekly NA/AA meetings. A section 364 review hearing was scheduled for January 28, 2025.

*Petitions Under Sections 388 and 387*

In September and October 2024, the attorneys for son and the de facto parent each filed a section 388 petition requesting that son be removed from mother's custody and placed with the de facto parent.[2]

---

[2] At the September 2024 review hearing, the juvenile court expressed concerns about son's safety with mother and considered directing the department to file a section 387 petition. The attorneys for son and the de facto parent stated that if the court did not remove son from mother's custody, they would file petitions to do so. Ultimately, the juvenile court decided it did not have the authority to order the department to file a section 387 petition but noted the parties could seek removal under section 388.

On December 12, 2024, the department filed a section 387 petition to remove son from mother's custody.  The petition alleged that on September 30, 2024, mother was evicted from her residence, she then moved several times between two different motels and a relative's home, and she was residing in a motel where she was behind on her rent and did not have sufficient food.  In addition, at 3:00 a.m. on November 22, 2024, son left mother's motel room, which was in a high crime area, and walked to his aunt's motel room.  The petition asserted son continued to be at risk due to mother's lack of behavioral change and resistance to services.

The social study for the detention hearing reported that since the prior review hearing, mother had not been complying with her case plan.  In addition to being behind on her rent, she and son climbed through the window to get into the motel room because she did not have a key.  Son reported eating at his aunt's home as mother barely had food in the home.  Mother refused to go into the tribe's sober living housing program, or the program offered through the Bakersfield American Indian Health Project.  Mother twice refused to drug test, and she had not re-enrolled in substance abuse counseling or attended AA/NA meetings.  Mother had no idea that son left the room in the middle of the night as she was asleep and did not hear anything, and when the social worker discussed with her how to prevent son from doing it again, she did not have an adequate safety plan.  The report noted mother's six latest drug tests showed one positive creatinine level, two presumptive positives for refusal to test, and three negative results.

At the December 16, 2024 hearing on the section 387 petition, the matter was continued but son was detained from mother and mother was granted twice-weekly two-hour supervised visits.  At the continued hearing on December 19, 2024, son's attorney withdrew his section 388 petition.  A contested hearing was held on detention with respect to the department's section 387 petition.  After receiving testimony from the department's and tribe's social workers, the juvenile court ordered son returned to mother, finding there was no proof of imminent risk to his physical health, but set the

8.

petition for a jurisdictional hearing on January 28, 2025, which was later continued to March 11, 2025.[3]  The juvenile court denied the de facto parent's 388 petition as moot.

In the department's report for the jurisdiction hearing on the section 387 petition, the social worker stated there had been ongoing concerns about son's safety after he was placed in mother's care.  Mother was not taking advantage of the services offered to her that would allow her and son to have housing stability.  They had moved six times since son was returned to her and they reportedly were seen walking the streets at various hours of the night.  Mother occasionally refused to drug test for the department or participate in court-ordered services.  Lastly, mother allowed father to have access to son, lied about father being around, and reportedly instructed son to lie about his contacts with father.

In January, a social worker witnessed father sitting in a car and then entering mother's building.  When the social worker knocked on mother's door, she delayed answering it for several minutes.  When she let the social worker in, mother denied having contact with father or that they were back together.  A few days later, a social worker saw mother sitting in a car like the one father was seen sitting in and then enter her building.  When the social worker knocked on mother's door, mother delayed answering it.  The social worker spoke with son privately, who shared the car was father's, father was in mother's room hiding in the closet, and he was hiding there during the social worker's prior visit.  Son said father lived with them.  Mother, however, denied any contact with father and when asked if she would be truthful in the future about contact with father, mother stated, "Nope!  I'm going to tell you guys whatever I want to tell you guys because it's none of your damn business."

The PAT educator informed the social worker that mother told her that father took her motel key without her knowledge and entered her room in the middle of the night.

---

[3]     Subsequent references to dates are to dates in 2025, unless otherwise stated.

Mother asked father to leave but he refused, so she contacted hotel staff. Mother did not contact law enforcement because of her problems with child protective services.

The social worker reported that mother had been drug and alcohol testing, and while her tests were indicative of maintaining a sober lifestyle, she had been asked to re-enroll in substance abuse counseling because she failed to test twice. Mother was participating in the PAT program and she had become more cooperative with staff. Mother agreed to receive mental health services for herself and son through the tribe. Son liked living with mother and felt safe with her.

The department initially recommended that the allegations of the section 387 petition be found true and son remain in mother's custody with family maintenance services, as mother was continuing with her case plan. By March, however, the department changed its recommendation and asked the juvenile court to dismiss the section 387 petition without prejudice and continue family maintenance services.

The department explained its recommendation changed because its safety concerns had been rectified and there was no imminent risk to son. While mother was living with a cousin, all but one of the adults in the home had some type of criminal history or child welfare history. Mother was asked to closely monitor son and not leave him alone with any of those relatives. Son told the social worker he saw father recently when father visited the relative's home and cut tires on a vehicle there, and sometimes he and mother spent the night with father at a motel.

Mother was receiving counseling services with the tribe and had enrolled son in a Head Start Program. During February, mother stopped drug testing, and she was not attending AA/NA meetings. She was assessed for substance abuse counseling, but she did not meet the criteria for treatment. While mother was making minimal progress, she continued to have patterns of doing okay for short periods of time and then being noncompliant and unstable for lengthy periods.

At the March 11 hearing on the section 387 petition, the juvenile court granted the department's motion to dismiss it without prejudice. The juvenile court continued the section 364 review hearing to April 30.

***The April 2025 Section 364 Review Hearing***

In a supplemental report for the April 30 review hearing, the social worker reported that mother's March 17 drug test was positive for cannabinoids natural (THC) and showed traces of amphetamines, but it was not positive, and the test was rejected as the quantity of urine was insufficient. When the social worker informed mother of the result, she denied using methamphetamines and said she had a prescription for cough medicine because she had a cough. On March 31, the social worker went to mother's home to attempt to drug test her, but mother was not home and while mother asked the social worker to wait for her, she did not arrive within a half hour.

Mother's participation in the PAT program was reported to be fair. Mother attended one scheduled home visit in March, was a no show for two March visits, and cancelled the third. During the one home visit, mother was attentive and participated in a parent-child interactive activity. The department attempted to drug test mother at her home on April 9 but mother did not immediately respond to a voicemail or text message, although she later texted that she was not home. A social worker spoke with mother's cousin, who believed mother was using substances, although she could not prove it, and mother told her she tested positive for amphetamines because she used the cousin's daughter's urine. The cousin said mother was always trying to avoid department staff. The cousin believed mother was participating in sexual favors and she was close to asking mother to leave her home. The social worker observed son to be well groomed, wearing clean and appropriate clothing for the weather, and physically healthy.

On April 15, mother reported she met with her parent educator weekly, she recently stopped receiving mental health services because the only counselor mother felt comfortable talking to was offered a different position, but she kept in touch with the

counselor via telephone. Mother did not have contact with the tribe as the tribe's social worker no longer worked for the tribe and the tribal representative did not answer her phone call. The social worker discussed drug testing, informing mother that her March 17 test was rejected due to an insufficient amount of urine, which mother explained by stating she had just used the restroom when the sample was collected.

The social worker spoke with the tribal representative on April 17 and asked for his thoughts if the department recommended dismissal of the case. The representative responded the tribe wanted the case dismissed, as mother had "done her part," and he confirmed the tribe would be involved with mother and son once the case was dismissed, but he was not sure what that would look like because he was trying to replace the tribe's prior social worker.

At that time, the department recommended that dependency be dismissed. The department asserted the prior risks were no longer an issue as mother had been appropriate, she appeared to be keeping son safe, she was receiving counseling from the tribe, and she enrolled son in preschool. Mother was taking son to doctor's appointments and keeping him free of safety hazards. She was attending PAT classes and engaging the facilitators. Son reported feeling comfortable and safe with mother. While mother moved around during most of the review period, she appeared to be trying to address her stability and son's needs, and they were living with relatives who appeared vested in son's safety and needs. The department asserted son appeared safe and no longer required the court's protection.

At the April 30 hearing, the juvenile court granted a request to continue the hearing. Before granting the request, the juvenile court commented that when it read the beginning of the department's report, it appeared that mother had turned the corner and was doing what she had been asked to do, but the report did not support that conclusion. Mother had only tested once although she was asked to test multiple times, and there was apparent contradiction in the report, as it stated the one test that she gave was positive for

cannabinoids but also that there was too little urine to test. In addition, cousin expressed concerns about mother and believed she was using, mother only attended one PAT session in March and blew off the rest, and son stated that mother and father would be getting a house together. The court told the department to look not just at the conclusion, but at the evidence supporting it, which was absent. The court stated it was very concerned about the recommendation and whether there was evidence to support it. The hearing was continued to June 17.

### *The June 2025 Section 364 Review Hearing*

In a supplemental report for the June hearing, the department reported recent problems locating mother and drug testing her. The tribe's new social worker informed the department on May 7 that mother had not been living with the cousin since April 30, as her cousin's husband threatened her, and she was living with her sister at an address on Lake Street. Son was still enrolled in school. The tribal and department social workers agreed to visit mother that afternoon. When the two social workers and a tribal representative went to the Lake Street address and asked for mother, the woman who answered the door said she did not know anyone by that name. The department and tribe followed up with mother's friend, who said that while mother came by earlier without son as he was in school, the friend was unaware of mother's whereabouts or her new address.

Mother called the social worker on May 8 and confirmed her address was an apartment on Lake Street, but the address was different than the one mother gave earlier. Mother said she did not contact the social worker because she was having trouble with her phone. Mother said she left her cousin's home because her cousin's husband threatened her with a gun.[4] The department and tribal social workers went to mother's

---

[4] The social worker obtained a crime report that showed mother contacted law enforcement. The report stated that mother was arguing with others at the residence about eviction and being kicked out. The police informed the parties of the eviction and

13.

new address that day and spoke with her and son and confirmed that they were living with son's aunt (mother's sister) and uncle, who said they were welcome to stay.

On May 21 and 22, mother did not respond to the department's calls or texts asking that she drug test for the department. When the social worker came to mother's home on May 22, a man who answered the door said mother was not there and a woman told her that mother was unable to return in a timely manner. The social worker drove to mother's last known location, a fast-food restaurant, but was unable to locate her. Mother called the social worker on May 22, who told mother she was attempting to contact her to randomly drug and alcohol test her and reminded mother the court needed to see negative test results to close her case on June 17. Mother said she understood, and that son completed school, and she was going to enroll him in kindergarten the following school year.

On May 23, the department social worker went to mother's home and knocked on the door and rang the doorbell and called and texted mother multiple times. After waiting 15 minutes, the tribe's social worker and representative arrived at the home. Uncle answered the door, but said mother and son were not home. Uncle confirmed they lived there, and he did not have concerns about her, but he did not know when they would be home. The department social worker drove around looking for mother and son but could not locate them. On May 28, the department again went to the mother's home to attempt to drug test mother, but she was not home.

Mother attended three scheduled home visits for the PAT program in April. She was noted to be attentive and actively participated in the parent-child interactive activity. Mother only attended one scheduled home visit in May. She cancelled one appointment, and the parent educator cancelled the other. Mother was working toward the goal of

restraining order processes. Mother advised that others at the residence were threatening her, but she was still at the residence and was not leaving.

complying with the department's request to obtain stable housing, and on providing positive discipline, improving communication, setting limits and following through with consequences.

On June 3, the social worker went to mother's home and spoke with aunt, who said mother and son left the home to go to a motel. Aunt believed mother may have "gotten some money" and wanted space, but she left belongings there and she may return. Aunt had not heard from mother and was unsure when she may return. The social worker asked aunt to have mother call her. The tribe's social worker told the department social worker that they would try to obtain more information on mother's whereabouts.

The following day, the tribe's social worker informed the department's social worker that the tribe did not know if mother and son were safe as mother was not drug testing or maintaining contact with the tribe. The department suggested calling law enforcement for a welfare check at the motel, but it could not be completed without a room number.

On June 5, mother called the social worker and shared she and son were doing well. They checked out of the motel the day before. Mother said she left aunt's home because they were unable to have long-term guests. Mother stated they would stay with aunt, where they were going that day, but also move around and stay with friends. Mother asked for a housing referral. Mother drug tested on June 6 and the results were negative. This was the only test mother provided since the last court hearing, and she was not participating in AA/NA meetings.

The department changed its recommendation to continued family maintenance services, as it did not appear that mother was ready to have dependency dismissed. The department explained the review period had been rocky for mother. She demonstrated instability with housing but had kept son safe. She obtained a stable residence for son when she was living with her cousin, but as of April 30, she had been living between homes. Mother claimed she did not consistently return the social worker's calls because

15.

she was having issues with her phone, and she was not readily available even after agreeing to meet with the department. Mother had not attended the Bakersfield Indian Health Project in the last couple months and while she was attending the PAT program, she was not consistent. Son was observed to be well groomed, healthy, and he did not have marks or bruises. Son indicated he was eating and sleeping well, and he felt safe. Son told the social worker that he had been sleeping at father's home, but he could not state when or where he last saw father.

Mother was present at the June 17 hearing. Her attorney stated he would not be presenting additional evidence but would argue for dismissal. Mother's attorney argued the focus should not be on mother's failures, but rather whether the conditions that justified the initial assumption of jurisdiction still existed or were likely to exist if supervision were withdrawn. The attorney argued there was no question mother was meeting son's basic needs, and he felt safe with mother. The attorney further argued dismissal of jurisdiction was justified because the bar had been set too high for mother as far as her court-ordered services, she would never be an "A parent," and she was getting passing grades even while not obeying the court's orders.

Son's attorney opposed dismissal. The tribe's attorney argued that conditions for jurisdiction still existed, with the tribe's main concern being the allegations of drug use and mother's lack of participation in drug testing. County counsel argued conditions for jurisdiction still existed because mother had not been drug testing, and substance abuse potentially led to her housing instability.

The juvenile court found there were statements in the department's reports that worked against the argument that mother was keeping son safe and there was a wealth of information that circumstances existed as they did when son came into protective custody and were likely to exist if supervision were withdrawn. The juvenile court noted that at every single turn mother was trying to thwart the department's and court's ability to see what was going on with son. Accordingly, the juvenile court found conditions still

16.

existed which would justify the initial assumption of jurisdiction, or such conditions were likely to exist if supervision were withdrawn. The court ordered family maintenance services to continue consisting of participation in the PAT program, attending weekly NA/AA meetings, submitting to random urine drug tests at least monthly, and if she tested positive, missed a drug test, or refused to test, she was required to see the gatekeeper to determine if she qualified for substance abuse counseling. The juvenile court set the next review hearing for December 15.

## DISCUSSION

### Section 364 Review Hearings and the Standard of Review

"After the child is declared a dependent, the juvenile court must review the status of the child every six months." (*In re Armando L.* (2016) 1 Cal.App.5th 606, 614 (*Armando L.*); accord, *In re N.O.* (2019) 31 Cal.App.5th 899, 922 (*N.O.*).) The applicable standard depends on the child's placement. (*N.O.*, at p. 922; *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1154.) If the child was removed from and remains out of parental custody, review hearings are governed by sections 366 and 366.21. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 649–650 (*Gabriel L.*).) If the child was not removed from parental custody, or, as here, was removed and later returned to parental custody, section 364 governs. (*Armando L.*, at p. 614; accord, *Gabriel L.*, at p. 650; *In re Shannon M.* (2013) 221 Cal.App.4th 282, 290–291.)

When conducting a review pursuant to section 364, " 'the court is not concerned with reunification, but with determining whether continued supervision is necessary in the family home.' " (*In re R.F.* (2021) 71 Cal.App.5th 459, 469.) The court makes its section 364 determination "based on the totality of the evidence before it, including reports of the social worker who is required to make a recommendation concerning the necessity of continued supervision." (*N.O.*, *supra,* 31 Cal.App.5th at pp. 922–923; § 364, subd. (b).)

17.

" 'Section 364, subdivision (c) establishes a statutory presumption in favor of terminating jurisdiction and returning the child to the parents' care without further court supervision.' " (*N.O.*, *supra*, 31 Cal.App.5th at p. 923.)  Specifically, it provides that the court, after hearing any evidence presented by the social worker, parent, guardian, or child, "shall determine whether continued supervision is necessary." (§ 364, subd. (c).)  The court "shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn.  Failure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (§ 364, subd. (c).)

We review a juvenile court's decision to continue its jurisdiction under section 364 for substantial evidence. (*In re J.F.* (2014) 228 Cal.App.4th 202, 209.)  We "do[] not reweigh the evidence, evaluate the credibility of witnesses, or draw inferences contrary to the finding of the trial court." (*Ibid*.)  Rather, we " 'accept[] the evidence most favorable to the order as true and discard[] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' [Citation.]  For evidence to be sufficient to support a trial court's finding, it must be reasonable, credible, and of solid value." (*Ibid*.)

*Analysis*

Mother contends the juvenile court erred in continuing jurisdiction at the June 2025 review hearing.  She argues the circumstances that led to the initial assumption of jurisdiction no longer existed and were not likely to exist if supervision were withdrawn because the evidence showed son was doing well in her care and he was safe with her.  Mother asserts that her lack of compliance with court-ordered services did not endanger son or justify keeping the case open to supervise him; therefore, it was unnecessary for him to remain a dependent.

18.

Dependency jurisdiction was taken over son in 2022 based on mother's failure to provide him with adequate food and shelter, and her untreated mental illness and substance abuse. She left son with a family friend indefinitely because she had no way to feed or provide for him, she was not receiving mental health services despite being diagnosed with anxiety and ADHD, and she continued to engage in substance abuse despite being offered services. Mother's substance abuse problem was a long term one, as shown by the following: her over 15-year history of drug use; her parental rights to son's half sibling were terminated in 2015, because she was unable to address her substance abuse problem; she and son's positive tests for amphetamines at his birth four years later; and mother's continued drug use thereafter.

Mother had some success addressing these problems during the reunification period. In March 2024, nearly 18 months into the dependency case, mother completed a substance abuse program in less than 90 days, but her drug testing for the department was inconsistent and she admitted to tampering with drug tests by using bottled urine. Other problems also became apparent. After an incident in May 2024, in which father assaulted mother and shoved his daughter during mother's supervised visit with son, mother admitted she had a history of domestic violence with father. Nevertheless, the juvenile court placed son with mother on family maintenance and ordered her to participate in counseling for substance abuse, the PAT program, attend AA classes, and submit to unannounced drug testing.

Thereafter, mother's pattern of housing instability, inconsistent participation in drug testing, ongoing exposure to domestic violence, and avoidance of case plan services continued. Taken together, mother's behavior demonstrated the risks prompting the juvenile court's intervention had not been ameliorated by the June 2025 review hearing.

Mother's chronic housing instability remained unresolved. She was evicted from her apartment in July 2024 and refused the department's and tribe's housing assistance, and she moved between motels and relatives' homes. By September 2024, she was

19.

residing in a motel with insufficient food and was behind on rent. She had difficulty supervising son as shown by him leaving their motel room at 3:00 a.m. and wandering to a relative's room, and when asked how she would prevent that from happening again, she had no realistic safety plan. Although she obtained some stability when she moved in with her cousin, several people living in the home had serious criminal histories and multiple substantiated child abuse and neglect referrals. By May 2025, mother was moving between homes, staying either with her sister or friends or in a motel room.

Mother's ongoing instability and refusal to engage in services mirrored her continued struggles with substance abuse. She missed multiple drug tests, provided a sample with an abnormal creatinine level, and refused to test on several occasions. Mother refused to attend AA/NA meetings, and she tested positive for cannabinoids in March 2025, and admitted to her cousin that she used the cousin's daughter's urine for a test.

Mother's lack of progress in sobriety was compounded by her continued association with father, whose history of domestic violence posed an ongoing risk to mother and son. The record reflects a history of domestic violence, including the May 2024 incident in which father assaulted mother, yet by January 2025, father was living in mother's motel room and mother lied to the department about his presence, asserting it was not the department's business, and told son to keep his presence a secret.

Mother's pattern of denial and defiance extended to her interactions with the department and the tribe. Her inability to maintain a safe and stable environment for son was demonstrated by her unwillingness to communicate with the department and tribe, missing appointments for services, and avoiding home visits even when the department and tribe were present for announced appointments. The tribe was concerned about whether mother and son were safe or housed. In March 2025, the family stabilization social worker closed mother's case because she met the six-month timeline and did not

20.

show any progress. Mother declined to participate in a welfare to work program or search for a job, and she ignored the social worker's calls.

The above evidence, when considered together, shows that, while there was no evidence that son was injured and he appeared content and safe with mother, the conditions that would justify the initial assumption of jurisdiction either existed or would likely exist if supervision were withdrawn.

Mother asserts jurisdiction cannot be taken based solely on a lack of housing or substance abuse. While true, it is not solely mother's housing instability or substance abuse that supports continued supervision. Rather, it is the constellation of mother's problems that potentially places son in harm's way. Mother admits the totality of the circumstances could cause concern but asserts that concern is allayed because mother was providing for son's needs, he was eating and sleeping well, he was healthy and groomed, and he expressed feeling safe in mother's care. But it is mother's unresolved problems that place son at a risk of harm.

In short, we see no reason to disagree with the juvenile court's decision to continue its jurisdiction under section 364, subdivision (c) as substantial evidence supports that decision.

## DISPOSITION

The juvenile court's June 17, 2025 order is affirmed.

21.

                                                    DESANTOS, J.

WE CONCUR:


DETJEN, Acting P. J.


MEEHAN, J.